**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**


| | |
|---|---|
| **TONY BETTIS, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 10-cv-2457-JAR** |
| ) | |
| **GARY HALL, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |


<u>**MEMORANDUM AND ORDER**</u>

Plaintiffs Tony Bettis, Eric Comeau, Steven Seat, and National Realty Capital, LLC

("NRC") filed this action against Defendants Gary L. Hall, Bentley Investments of Nevada, LLC

("Bentley"), and the Gary L. Hall Revocable Trust ("Trust") for breach of contract and quantum

meruit.  After the Court's ruling on Defendants' earlier dispositive motion, Plaintiffs' remaining

claims allege breach of contract against Defendant Gary Hall and quantum meruit against

Defendants Bentley and the Trust.  Plaintiffs seek damages for unpaid profits that they claim are

owed under the contract they entered into with Hall; Plaintiffs allege that these profits were

instead paid to Bentley, Hall, and the Trust.

This matter is before the Court on Defendants' Motion for Partial Summary Judgment

(Doc. 86) and Plaintiffs' Motion for Partial Summary Judgment on the Issue of Contract

Interpretation (Doc. 88).  As fully explained below, because the contract states that the full

amount of overhead needed to be repaid before any profits were distributed, the Court denies

Plaintiffs' motion for summary judgment.  But because Plaintiffs may still be entitled to profits

under the proper interpretation of the contract for a number of projects and Plaintiffs' evidence

shows that Bentley received and retained a benefit from Plaintiffs, Defendants' motion is granted in part and denied in part.

## I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law."[1] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[3]  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[4]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[5]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[6]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to

---

[1]Fed. R. Civ. P. 56(c).

[2]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

[3]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[4]*Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[5]*Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[6]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671).

"set forth specific facts showing that there is a genuine issue for trial."[7]  The nonmoving party

may not simply rest upon its pleadings to satisfy its burden.[8]  Rather, the nonmoving party must

"set forth specific facts that would be admissible in evidence in the event of trial from which a

rational trier of fact could find for the nonmovant."[9]  To accomplish this, the facts "must be

identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated

therein."[10]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge

and shall set forth such facts as would be admissible in evidence.[11]  The non-moving party

cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by

specific facts, or speculation.[12] "  "Where, as here, the parties file cross motions for summary

judgment, we are entitled to assume that no evidence needs to be considered other than that filed

by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to

material facts."[13]

     Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it

is an important procedure "designed to secure the just, speedy and inexpensive determination of

---

[7]*Anderson*, 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[8]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[9]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[10]*Adams*, 233 F.3d at 1246.

[11]Fed. R. Civ. P. 56(c)(4).

[12]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[13]*James Barlow Family Ltd. P'ship v. David M Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted).

every action."[14]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[15]

## II.  Uncontroverted Facts

District of Kansas Local Rule 56.1 outlines the proper procedures for stating the material facts and for addressing the other party's statement of material facts.  When opposing a motion for summary judgment, a party must begin its memorandum in opposition "with a section containing a concise statement of material facts as to which the party contends genuine issues."[16]  The Rule continues, describing the proper format for the concise statement: "Each fact in dispute must be numbered by paragraph, refer with particularity to those portions of the record upon which the opposing party relies, and if applicable state the number of movant's fact that is disputed."[17]  Additionally, when a non-moving party adds material facts in the response brief, the moving party must respond to the additional material facts in the same manner—with a concise statement as to which additional facts the party contends genuine issues.[18]  Under Federal Rule of Civil Procedure 56(e), if a party fails to properly address another party's assertion of fact, the court may consider the fact undisputed for purposes of the motion.  But still, in so doing, the court must be certain that no undisclosed factual dispute would undermine the uncontroverted

---

[14]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15]*Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

[16]D. Kan. R. 56.1(b)(1).

[17]*Id.*

[18]D. Kan. R. 56.1(c).

facts.[19]

With the above rules of law and principles of application in mind, the following facts are stipulated to or uncontroverted.[20]  In 2004, Defendant Hall was seeking real estate investment opportunities.  Hall became acquainted with Plaintiffs Comeau, Bettis, and Seat when they approached him with a business plan to employ Hall's disposable capital by lending money secured by real estate as well as by investing in equity partnerships involving real estate.  Hall had previously met Comeau because Comeau worked at a bank where Hall had done business.  Hall decided to proceed with the investment plan that Plaintiffs proposed.  Under the proposed investment plan, Comeau, Seat, and Bettis would locate real estate investment opportunities and present them to Hall.  If Hall approved the project, he would provide funds to invest in the real estate project.  In return for Plaintiffs work, Hall would compensate Plaintiffs by advancing them funds on a monthly basis to cover their overhead costs.

To memorialize the agreement, Comeau, Bettis, Seat, and Hall entered into a written contract, the Funding Agreement.  In accordance with the Funding Agreement, Comeau, Bettis and Seat formed NRC to locate the real estate investments, including loans and equity participations, and Plaintiffs began to work for Hall full time.  The Funding Agreement also

---

[19]*Thomas v. Bruce*, 428 F. Supp. 2d 1161, 1163 (D. Kan. 2006).

[20]While Plaintiffs, in their Response to Defendants' motion for summary judgment, controverted some of Defendants' material facts, they did not do so in a concise statement using numbered paragraphs, thereby placing an additional burden on the Court to determine which facts were controverted.  Further, in Plaintiffs' Reply for their own motion for summary judgment, Plaintiff failed to address the additional facts in the Defendants' Response as required under District of Kansas Local Rule 56.1(c).  Normally, under Federal Rule of Civil Procedure 56(e), the Court would treat the facts that were unaddressed as undisputed.  But because Plaintiff already addressed and controverted some of these facts in their response to Defendant's motion for summary judgment, the Court will treat the facts that were previously addressed as controverted for purposes of Plaintiffs' motion for summary judgment as well.  The Court, however, advises Plaintiffs to consult the District of Kansas Local Rules before making any future filings with the Court.

required the formation of other limited liability companies, or Lending Entities, formed to serve

as the lender and to hold any assets for each real estate investment project.  In total, six

individual Lending Entities—each owned 100% by Hall—were formed: Bentley Investments of

Nevada, LLC ("Bentley"), Bentley Investments of Nevada II, LLC (Bentley II"), Bentley

Investments of Nevada III, LLC ("Bentley III"), Bentley Investments of Nevada IV, LLC

("Bentley IV"), Bentley Investments of Nevada V, LLC ("Bentley V"), and Bentley Investments

of Nevada VI, LLC ("Bentley VI").  Hall formed Bentley for the purpose of providing funding

and receiving payments for the real estate investment projects.  Lending Entities Bentley II

through Bentley VI simply held assets acquired in the course of the real estate investments.  The

Trust is the sole member of Bentley and the Bentley II through VI entities.  Hall is the trustee of

the Trust.

Proceeding under the Funding Agreement, in July of 2004, Hall began to advance

Plaintiffs funds for "Overhead Costs," which is defined in the Funding Agreement as salaries,

health insurance expenses, travel expenses, phone and facsimile expenses of Comeau, Bettis, and

Seat, as well as supplies and start-up expenses of NRC.  In July 2004, Hall advanced Plaintiffs

$40,000.  On a monthly basis after that, through December of 2009, Hall advanced Plaintiffs

$58,500 per month.  In January and February 2009, Hall advanced Plaintiffs $41,500 per month.

Hall then stopped advancing Plaintiffs funds for Overhead Costs.  The Funding Agreement

specified that the Overhead Costs were not considered a loan for which Comeau, Bettis and Seat

were personally liable.  Instead, the Overhead Costs were to be repaid from the cash revenues

generated by the Lending Entities.

As Hall was performing this obligation under the Funding Agreement by advancing

funds, Plaintiffs performed their obligation under the Funding Agreement by finding real estate

investment opportunities.  Hall invested in several real estate projects over a period of five years.

Six of those projects—Terra Bentley I, Terra Bentley II, Stonewall Springs, Morley Bentley,

Morley Cottonwood, and Morley FLP—have either failed to turn a profit or will not be

profitable for many years and are thus not in dispute in this lawsuit.  Other projects have

generated cash revenues that were distributed under the Funding Agreement.  Those projects are

Weibel-RBND, Morley SWAT, Shorefox, Grand Elk, Morley Companies Family Development

("MCFD"), SWAT 15, and Porchlight.  The parties dispute whether the final project, Grand

Lodge, has generated cash revenues and profits that are distributable under the Funding

Agreement.

Under the Funding Agreement, the cash revenues from these projects would be

distributed by each Lending Entity in a certain order listed in sections 5(a)–(f) of the Funding

Agreement:

>    (a) Repayment of the Debt Portions which may be paid to a third party institution
>    or to Hall if he has chosen to replace third party financing;
>
>    (b) Return to Hall the aggregate Overhead Costs advanced by him plus the
>    associated 7% annualized return;
>
>    (c) Return to Hall an amount equal to the Equity Portion invested by Hall in each
>    Lending Entity (including any transaction costs, if applicable);
>
>    (d) Return to Hall (and to NRC, Bettis, Seat, and Comeau, if applicable) the pre-
>    agreed upon preferred return to Hall based on the 30% Equity Portion.  Risk
>    profiles of each transaction shall yield a preferred return between the Prime Rate
>    plus 6% to the Prime Rate plus 10%. . . ;
>
>    (e) Remaining cash revenues and profits shall be allocated and distributed 70% to
>    Hall and 30% to NRC.  NRC shall, after Hall receives the amounts he advances to
>    NRC pursuant to paragraph 1, including the 7% annualized return specified
>    thereunder, use its 30% distribution to fund Working Capital Reserve which shall
>    have a balance of at least $350,000 at all times, to be used for Overhead Costs;

7

(f) Once Hall achieves a 25% annualized rate of return on his equity investment in a particular Lending Entity, cash revenues, and profits in a particular Lending Entity shall be allocated and distributed 50% to Hall and 50% to NRC . . . .[21]

Thus, the cash revenues would first be distributed under section 5(a), and if any cash revenues remained after satisfaction of section 5(a), the revenues would then be distributed under section 5(b).  If any cash revenues remained after satisfaction of section 5(b), the cash revenues would then be applied to the section 5(c).  This process would continue until the cash revenues were depleted.  If a real estate investment project generated enough cash revenues to pay off the amounts listed in sections 5(a)–(d), Plaintiffs would have the opportunity to earn profits in sections 5(e) and (f).  If, however, a project did not generate enough cash revenues to fully satisfy sections 5(a)–(d), Plaintiffs would not be entitled to any profits.  Any profits Plaintiffs earned under sections 5(e) and (f) would be in addition to and separate from the Overhead Costs that Hall already advanced.

Beginning on the date of the Funding Agreement and continuously after, Hall, Hall's accountant Keith Noe, and Bentley, together with NRC kept track of all funds advanced and received by Hall in connection with the Lending Entities and real estate investment projects.  One or more times per year beginning in 2005, NRC provided to Hall and Bentley a bound summary of investment activity that they created and titled the "Bentley Portfolio Summary" ("Bentley Books").  The parties met regularly to discuss the investment activities and the financial records contained in the Bentley Books.  In all of the Bentley Books, Plaintiffs allocated Overhead Costs on a pro-rata basis to each of the Lending Entities based on the project's capital investment.

[21]Doc 89, Ex. A, § 5.

The Bentley Books not only accounted for the costs of the real estate investments, but also detailed the cash generated by those projects.  Section 3 of the June 2009 Bentley Books shows the profits and cash revenues of Weibel-RBND, Morley SWAT, Shorefox, Grand Elk, MCFD, SWAT 15, Grand Lodge, and Porchlight.   This section shows the gross income distributable under paragraph 5 of the Funding Agreement and the amount of debt of other income that needed to be repaid under section 5(a).  Weibel-RBND generated $107,167 in gross income with no payments necessary for debt or other expenses, leaving $107,167 distributable under sections 5(b)–(e) of the Funding Agreement.  Morley SWAT generated $605,028 in gross income with $186,449 paid to debt and other expenses, leaving $418,579 distributable under sections 5(b)–(e).  Shorefox generated $1,146,743 in gross income with $79,418 paid to debt and other expenses, leaving $1,067,325 distributable under sections 5(b)–(e).[22]  Grand Elk generated $1,632,679 in gross income with $406,291 paid to debt and other expenses, leaving $1,226,388 distributable under sections 5(b)–(e).  MCFD generated $23,896 in gross income with no payments necessary for debt or other expenses, leaving $23,896 distributable under sections 5(b)–(e).  SWAT 15 generated $209,466 in gross income with no payments necessary for debt or other expenses, leaving $209,466 distributable under sections 5(b)–(e).  Porchlight generated $68,892 in gross income with no payments necessary for debt or other expenses, leaving $68,892 distributable under sections 5(b)–(e).  As for the Grand Lodge project, the final units of the

---

[22]These amounts for Shorefox and Grand Elk conflict with figures provided in Defendants' statement of facts, but not with the document that Defendants cited to support their statement of facts.  In fact, these amounts are taken from Defendants' Exhibit F, at 16, which Defendants used to calculate the amount of revenue and profits generated by each project.  It seems Defendants transposed some amounts when transferring these numbers from their exhibit to their brief.  For example, Defendants state that they earned $204,692 in profits on Shorefox.  The document shows that they were instead allocated $749,459 in profits.  The $204,692 was the amount allocated to Plaintiffs as profits.  In Grand Elk, it seems the Defendants accidentally used the amount of profits from Shorefox, which is on a line directly above the profits for Grand Elk.

condominium have been sold, but a judgment entered against the project in excess of $879,000 is currently on appeal in the Utah court system and is accruing interest.

The Bentley Books also detailed how Plaintiffs accounted for the distribution of the gross income from each project, showing payments due to Overhead Costs, to Hall for profits, and to NRC for profits.  On the Morley SWAT, Shorefox, Grand Elk, MCFD, SWAT 15, Grand Lodge, and Porchlight projects, the Bentley Books show that NRC was entitled to profits.  With the exception of Grand Lodge, however, all cash revenues from each project were paid to Hall or Bentley and no payments were received by NRC.  The Bentley Books show that NRC used the amounts listed as their profits to reduce Overhead Costs.  But NRC states that it received $182,046.80 from the Grand Lodge project, which was not used to reduce Overhead Costs, though Defendants claim that all money generated by Grand Lodge was paid to Hall under the Funding Agreement.

In 2009, Hall, disappointed with the overall results obtained by the individual plaintiffs, advised Comeau, Bettis, and Seat that he was going to stop providing funds under the Funding Agreement.  On November 11, 2009, Comeau sent an e-mail to Hall advising Hall that NRC had $450,350 of profit allocation under section 5(e) "left in the deals" and that "[i]t was always our understanding that at some point these monies would be dispersed when profits are available."[23] Hall replied via e-mail on November 12, 2009, stating, "Eric I am sure these numbers are correct and you will get credit when money is available. . . ."[24]  Plaintiffs, however, did not receive the amount they requested.  Plaintiffs filed this action against Defendants on August 17, 2010,

---

[23]Doc. 89, Ex. H.

[24]*Id.*

seeking the amount listed in the Bentley Books as NRC profits and designated for Overhead Cost reduction.

## III.   Discussion

Defendants move for summary judgment, arguing that, as a matter of law, Plaintiffs have failed to show any entitlement to profits under the Funding Agreement and thus Plaintiffs cannot succeed on their breach of contract claim.  Defendants further argue that because Defendants Bentley and the Trust received no benefit from Plaintiffs, Plaintiffs cannot succeed on their quantum meruit claim.  Defendants also add that many of Plaintiffs' claims are barred by the statute of limitations or waiver and equitable estoppel.  Plaintiffs, on the other hand, seek summary judgment on the proper interpretation of the Funding Agreement.  Both Plaintiffs' and Defendants' motions for summary judgment rely on different interpretations of the Funding Agreement.  And so resolution of both motions necessarily turns on the proper interpretation of the Funding Agreement between Plaintiffs and Defendant Hall.  The Court will first discuss Defendants' motion for summary judgment on the breach of contract claim, which will also resolve Plaintiffs' motion for summary judgment.  The Court will then discuss Defendants' motion for summary judgment on the quantum meruit claims.

### A.   Breach of Contract

#### 1.   *Contract Interpretation*

Plaintiffs claim that Defendant Hall breached his duties under the Funding Agreement by failing to pay them profits from various real estate investment projects.  All parties agree that the Funding Agreement is a valid contract and governs the dispute in this case.  Both sides also argue that the contract is clear and unambiguous, but the parties disagree on the clear and

unambiguous interpretation of the contract.  Thus, the Court must determine the proper interpretation of the Funding Agreement.

"[A] federal court sitting in diversity must apply the substantive law of the state in which it sits, including the forum state's choice-of-law rules."[25]  Under Kansas law , the *lex loci contractus* doctrine applies, requiring the Court to apply the law of the state where the contract is made.[26]  A contract is made where the last act necessary for its formation occurs.[27]  Although the parties have not given the Court any information about where the parties entered into the Funding Agreement, both parties agree that Kansas law should apply.  "'Generally the party seeking to apply the law of a jurisdiction other than the forum has the burden to present sufficient facts to show that other law should apply.'"[28]  Because neither party seeks to apply the law of another jurisdiction or gives any fact to show that another jurisdiction's law applies, the Court applies Kansas law.

Generally, under Kansas law, if the language in a written contract "is clear and can be carried out as written, there is no room for rules of construction.  To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language."[29]  "'In considering a contract which is unambiguous and whose language is not doubtful or obscure, words used therein are to be given their plain, general and common meaning, and a contract of this character is to be enforced

---

[25]*Boyd Rosen & Assocs., Inc. v. Kan. Mun. Gas Agency*, 123 F.3d 1351, 1352–53 (10th Cir. 1997).

[26]*Found. Prop. Invs., LLC v. CTP, LLC*, 159 P.3d 1042, 1046 (Kan. Ct. App. 2007).

[27]*Id.* (citing *Novak v. Mut. of Omaha Ins. Co.*, 28 P.3d 1033 (Kan. Ct. App. 2001)).

[28]*Id.* (quoting *Layne Christensen Co. v. Zurich Can.*, 38 P.3d 757 (Kan. Ct. App. 2002)).

[29]*Gore v. Beren*, 867 P.2d 330, 336 (Kan. 1994) (quotation omitted).

according to its terms.'"[30] "'The cardinal rule of contract interpretation is that the court must ascertain the parties' intention and give effect to that intention when legal principles so allow.'"[31] "Where a contract is complete and unambiguous on its face, the court must determine the parties' intent from the four corners of the document, without regard to extrinsic or parole evidence."[32]  Even if the parties interpretations of the contract differ, the Court need not resort to parol evidence to interpret the contract meaning if the contract is complete and unambiguous.[33]

Here, the dispute between Plaintiffs' and Defendants' interpretation of the contract surrounds the provision for distribution of the cash revenues of each real investment project. Paragraph 5 of the Funding Agreement governs the distribution and allocation of cash revenues and profits of each Lending Entity, which holds the funds for each real estate investment project. Paragraph 5 is divided into sections 5(a)–(f).[34]

Both parties agree that under the Funding Agreement, Plaintiffs are not entitled to payment of profits until sections 5(a)–(d) are satisfied.  Where the parties differ in their interpretation of the contract is the proper application of section 5(b)—"Return to Hall the aggregate Overhead Costs advanced by him plus the associated 7% annualized return." Plaintiffs contend that section 5(b) requires the repayment of the Overhead Costs that they allocated to each real estate investment.  But they argue that section 5(b) does not require the

---

[30]*Wagnon v. Slawson Exploration Co.*, 874 P.2d 659, 666 (Kan. 1994) (quoting *Barnett v. Oliver*, 672 P.2d 1228, 1238 (Kan. Ct. App. 1993)) (internal quotation omitted).

[31]*Kay-Cee Enter., Inc. v. Amoco Oil Co.*, 45 F. Supp. 2d 840, 843 (D. Kan. 1999) (quoting *Ryco Packaging Corp. v. Chapelle Int'l, Ltd.*, 926 P.2d 669, 674 (1996)).

[32]*Id.* (citing *Simon v. Nat'l Farmers Org., Inc.*, 829 P.2d 884, 887–88 (Kan. 1992)).

[33]*See Decatur Cnty. Feed Yard, Inc. v. Fahey*, 974 P.2d 569, 575 (Kan. 1999).

[34]*See supra* pp. 7–8.

13

repayment of all Overhead Costs advanced by Hall throughout the entire Funding Agreement relationship.  Thus, under Plaintiffs' interpretation of section 5(b), paragraph 5 contemplates the payment of profits under sections 5(c)–(f) while some Overhead Costs remain unpaid.

Defendants interpret section 5(b) differently.  Defendants state that because section 5(b) requires the repayment of "aggregate Overhead Costs," the total amount of the Overhead Costs advanced by Hall must be repaid before any revenues are distributed under sections 5(c)–(f).  Defendants argue that the contract does not allow parties to allocate Overhead Costs to each project.  Under Defendant's interpretation, the contract does not contemplate any payment of profits to NRC until all Overhead Costs are repaid.

By applying the principles used to interpret contracts under Kansas law, the Court finds that Defendants' interpretation is correct because the contract clearly and unambiguously requires a return of all Overhead Costs advanced by Hall (plus the 7% annualized return) before any remaining revenues may be distributed under sections 5(c)–(f).  This interpretation is clearly and unambiguously demonstrated in section 5(b), the entirety of paragraph 5, and the entirety of the Funding Agreement.

The Court first focuses on the language in section 5(b): "Return to Hall the aggregate Overhead Costs advanced by him plus the associated 7% annualized return."  Plaintiffs' argument that only those Overhead Costs allocated to a specific project needed to be repaid under section 5(b) directly contradicts the plain language of that section.  Section 5(b) does not mention any allocated Overhead Costs.  On the contrary, it specifies that *aggregate* Overhead Costs must be repaid.  Aggregate in its plain, common meaning is a collection, sum, or total.  For the Court to interpret section 5(b) in the manner that Plaintiff suggests, it would have to interpret

the term aggregate to have a meaning completely antonymous to its common usage.  Instead, the Court will interpret the contract so that "aggregate" retains its common meaning, requiring the repayment of the total Overhead Costs under section 5(b).

The entirety of paragraph 5 also supports the interpretation that all Overhead Costs must be repaid under section 5(b) because when the parties intended to allocate costs, they did so explicitly.  Plaintiffs argue for the opposite conclusion by pointing to all of the instances in paragraph 5 that reference each Lending Entity or each transaction.  Plaintiffs state that these references suggest that Overhead Costs were also allocated to each transaction.  The Court disagrees and finds instead that the references to each Lending Entity or transaction in paragraph 5 bolster the Court's conclusion that all Overhead Costs had to be repaid under section 5(b).  No reference to a specific project or Lending Entity is ever made when discussing Overhead Costs. That the parties explicitly identified and allocated the Equity Portion for "each Lending Entity" in section 5(c), the risk profiles for "each transaction" in section 5(d), and the 25% annualized rate of return on Hall's equity investment "in a particular Lending Entity" in section 5(f) suggests that when the parties intended to allocate a repayment amount to a particular Lending Entity or transaction, they did so.[35]  That the parties omitted such language from section 5(b) when they used it elsewhere in sections 5(c), (d), and (f) shows that the parties did not intend to allocate Overhead Costs to a particular project or Lending Entity.

Further, Plaintiffs' argument that the language in section 5(e) supports their interpretation of the contract is similarly unavailing.  Section 5(e) states that the cash revenues and profits remaining after payment of sections 5(a)–(d) should be allocated and distributed 70% to Hall and

---

[35]*See* Doc. 89, Ex. A, § 5.

30% to NRC.  But it states that NRC must pay its portion of profits received under section 5(e), after Hall receives his Overhead Costs and 7% return, to fund the Working Capital Reserve until it is fully funded.  Plaintiffs suggest that because section 5(e) states that they should use their portion of the profits to fund the Working Capital Reserve after Hall receives his Overhead Costs, they must have been able to receive profits, without funding the Working Capital Reserve, before Hall receives all of his Overhead Costs.  Reading section 5(e) in isolation, Plaintiffs interpretation is possible.  But it is equally, if not more, likely that section 5(e) simply reiterates the fact that Hall must receive a return of all Overhead Costs and the 7% annualized return before Plaintiffs can share in profits, adding that those profits must then be used to fund the Working Capital Reserve until it is fully funded.  And the Court must not consider a provision of a contract in isolation, "but must instead construe the term in light of the contract as a whole, such that if construction of the contract in its entirety removes any perceived ambiguity, no ambiguity exists."[36]   Section 5(e) does not contradict or create any ambiguity in the clear language of section 5(b), which requires the payment of aggregate Overhead Costs before any payments are made under sections 5(c)–(f).  And thus the entirety of paragraph 5, including section 5(e), supports the Defendants' interpretation of the contract.

Defendants' interpretation of the contract is also supported by the entire Funding Agreement.  In paragraph 1, Overhead Costs are defined as all funds provided on a monthly basis to cover "salaries, health insurance expenses, travel expenses and phone and facsimile expenses of Bettis, Seat and Comeau and other miscellaneous supplies and start up expenses that

---

[36]*Simon v. Nat'l Farmers Org., Inc.*, 829 P.2d 884, 888 (Kan. 1992) (citing *Arnold v. S.J.L. of Kan. Corp.*, 749 P.2d 64 (1991)).

NRC will incur."[37]  Nowhere in paragraph 1 does the Funding Agreement refer to a division or allocation of the Overhead Costs to specific projects or Lending Entities.  In fact, paragraph 1 never mentions different projects or Lending Entities at all.  Outside of paragraph 1, the Funding Agreement consistently treats Overhead Costs as a single, aggregate amount.  Anytime Overhead Costs are mentioned in the Funding Agreement, they are mentioned as a total sum, and nowhere in the Funding Agreement is an allocation or division of Overhead Costs mentioned.

Other provisions of the agreement not dealing with Overhead Costs demonstrate that the parties knew how to allocate costs when they intended that result.  An example of such allocation is paragraph 2, which deals with the Debt Portion and Equity Investment.  Paragraph 2 states in relevant part: "On projects approved by Hall, Hall agrees to advance funds to *each* of the Lending Entities as follows . . . ."[38]  Paragraph 2 then goes on to state that these advances for each Lending Entity will be called the Debt Portion and Equity Investment.  Repayment of each of these amounts is also addressed in paragraph 5.  Paragraph 5 treats those amounts as the amount advanced for each Lending Entity.  Thus, had the parties intended to allocate the Overhead Costs to each project, they would have explicitly done so in the Funding Agreement as they did for other amounts.

By interpreting section 5(b), the entirety of paragraph 5, and the entirety of the Funding Agreement, it is clear that the parties intended all Overhead Costs to be repaid before any distribution of cash revenues was made under section 5(c)–(f) of the Funding Agreement.  This interpretation precludes payments of profits to Bettis, Seat, Comeau, or NRC before all

---

[37]Doc. 89, Ex. A, § 1.

[38]*Id.* § 2 (emphasis added).

Overhead Costs are returned.  And thus, the Court must deny Plaintiffs' motion for summary on the interpretation of the Funding Agreement.

This denial, however, is not dispositive of Plaintiffs claims and does not automatically require the Court to grant Defendants summary judgment on the breach of contract claim. Plaintiffs may still have been owed profits for some of the projects because the aggregate Overhead Costs may have been repaid in full by some of the projects' cash revenues.  In fact, contrary to Defendants' assertions, the Court finds that for some projects, the aggregate Overhead Costs were repaid in full, allowing for distribution under section 5(c) and possibly sections 5(d)–(f) of the Funding Agreement.

Defendants claim that the aggregate Overhead Costs were never repaid.  Indeed, Defendants claim that over $3.4 million is still outstanding for Overhead Costs.  Although Plaintiffs did not dispute Defendants' calculation of outstanding aggregate Overhead Costs, the Court finds that Defendants, as a matter of law, incorrectly applied the cash revenues from each project to paragraph 5 of the Funding Agreement.  As a result, their calculation of outstanding aggregate Overhead Costs is incorrect.  Defendants' calculation assumes that Defendant Hall could receive profits and payments under sections 5(c)–(f) before the aggregate Overhead Costs were repaid under section 5(b).  But as described above, the Funding Agreement clearly and unambiguously states that until all Overhead Costs are repaid under section 5(b), no revenue will be distributed to *anyone* under sections 5(c)–(f), which means that until all Overhead Costs are repaid, Defendant Hall was not entitled to payment for the Equity Portion under section 5(c), preferred rate of return under section 5(d), or profits under sections 5(e) and (f).  And so, Defendants' calculation of outstanding aggregate Overhead Costs is greatly inflated because it

does not account for large payments that should have been made to the Overhead Costs but were instead designated as profits paid to Defendant Hall.

On the Weibel-RBND project, for example, Defendants state that of the $107,167 gross income, Hall was repaid $79,268 as Overhead Costs and $27,899 as profit. At the time that Weibel-RBND cash revenues were distributed, the aggregate Overhead Costs were $391,000.[39] Thus, the gross income was insufficient to repay the aggregate Overhead Costs, and as a result, no one could receive profits under the Funding Agreement for Weibel-RBND. This means that the $27,899 that Defendants state was paid to Hall as profits should have been used to repay the aggregate Overhead Costs. Applying the Funding Agreement properly, $107,167 of aggregate Overhead Costs were repaid from the cash revenues of Weibel-RBND, and as a result, after the Weibel-RBND project, outstanding aggregate Overhead Costs were $283,833.

Defendants made the same mistake for the Morley SWAT project, stating that $178,172 were paid to Hall as repayment of Overhead Costs and $240,407 as profits. At the time Morley SWAT distributions were made, the outstanding balance of aggregate Overhead Costs was $459,333.[40] Thus, the $240,407 profit figure should have been used to repay the aggregate Overhead Costs, making $418,579 available for payment of Overhead Costs. Again, those amounts were insufficient to completely satisfy section 5(b), leaving $40,754 in aggregate Overhead Costs after Morley SWAT cash revenues were distributed. Yet again, on Morley SWAT, no one could receive any profits. Proper application of the Funding Agreement thus clearly shows that neither Weibel-RBND nor Morley SWAT generated enough revenue to repay

---

[39]This amount does not include the 7% annualized return, but is based on Defendants' calculation of Overhead Costs advanced. *See* Doc. 87, Ex. J.

[40]Again, this amount does not take in to account the 7% annualized return.

the aggregate Overhead Costs and therefore Plaintiffs were not entitled to profits on either project.

The same, however, cannot be said for the remaining projects.  The Court cannot determine on the summary judgment record whether Plaintiffs are entitled to profits for the remaining projects.  In Shorefox, for example, Plaintiffs may have been entitled to profits.  Shorefox generated $1,146,743 in gross income.  From that amount, debt and other expenses of $79,418 were paid under 5(a), which means that $1,067,325 were available to repay Overhead Costs.[41]  At the time that funds were distributed for Shorefox, the total Overhead Costs that Hall had advanced were $976,000, but $525,746 of this amount had been repaid from the Weibel-RBND and Morley SWAT project, leaving $450,254 in aggregate Overhead Costs outstanding at the time the Shorefox revenues were distributed.  So the cash revenues from Shorefox were sufficient to repay the aggregate Overhead Costs with $617,071 in cash revenues left for distribution.  But the Court runs into trouble when attempting to determine the amount of funds remaining for distribution under sections 5(c)–(f).  Section 5(b) not only requires the repayment of aggregate Overhead Costs, but also the 7% annualized return.  The Court does not have sufficient information to determine the balance remaining to be repaid under 5(b) because Defendants miscalculated the outstanding Overhead Costs, which in turn inflated 7% annualized return.[42]  It is clear, however, that the cash revenues from Shorefox would have been sufficient to repay the aggregate Overhead Costs plus the 7% annualized return under section 5(b) of the Funding Agreement, leaving funds available for section 5(c) and possibly sections 5(d)–(f).

---

[41]Defendants stated that $317,867 were repaid to Overhead Costs and $204,692 were paid to Hall as profit. The exhibit they cite for support shows, however, that he was paid $749,459 in profits.

[42]This also does not account for Overhead Costs repaid from any brokerage fees.

Thus, Defendants are not entitled to summary judgment on Plaintiffs' claim for profits on the Shorefox project.

The Court runs into the same problem with the remaining projects, such that the Court cannot determine whether Plaintiffs were entitled to profits—and if so, in what amount. The Court, therefore, directs the parties to meet and confer to determine the correct calculations of profits using the interpretation of the Funding Agreement as described by the Court above, where all Overhead Costs and the 7% annualized return under section 5(b) must be repaid before any distribution are made under sections 5(c)–(f). The Court notes that both parties relied on the calculations provided in the Bentley Books to determine the gross income and Debt Portion. The parties merely need to apply these numbers to the Funding Agreement in the manner described above and provide the Court with a clear and concise explanation of amounts that were repaid under sections 5(a)—(f) of the Funding Agreement for projects Shorefox, Grand Elk, MCFD, SWAT 15, and Porchlight, which all survive summary judgment. As stated above, Plaintiffs were not entitled to profits on Weibel-RBND and Morley SWAT. Plaintiffs did not claim profits on Weibel-RBND, and thus Defendants' motion for summary judgment on the Weibel-RBND project is moot. But Defendants' motion for summary judgment on the Morley SWAT project is granted.

This leaves one project for the Court to discuss—Grand Lodge. The Court finds that there is a genuine issue of material fact as to whether the Grand Lodge project has generated cash revenues that are distributable under the Funding Agreement. Plaintiffs argue that cash revenues from Grand Lodge are distributable and have been distributed to both NRC and Hall. Defendants argue that it is undisputed that the project has not yet closed and therefore any

21

distribution under the Funding Agreement is premature and speculative.  At the same time, however, Defendants list as an undisputed fact that "[w]hen the Grand Lodge money was received, all money was paid to Hall pursuant to the Funding Agreement."[43]  Defendants thus have themselves created a genuine issue of material fact as to whether Grand Lodge funds are payable under the Funding Agreement.  If funds were distributed under the Funding Agreement, they should have been distributed using the method that the Court described above for the earlier projects.  Depending on the outstanding aggregate Overhead Costs at the time of distribution, Plaintiffs may be entitled to profits.  But whether funds were distributed under the Funding Agreement is a genuine issue of material fact, and therefore Defendants are not entitled to summary judgment on the breach of contract claim for the Grand Lodge project.

### 2.      Waiver or Equitable Estoppel

Defendants also argue that Plaintiffs' claims for breach of contract are barred by waiver and equitable estoppel.  Defendants state that because Plaintiffs allowed Defendants to retain all of the funds from the projects, Plaintiffs have waived their rights to those profits.  For similar reasons, Defendants argue the Court should estop Plaintiffs from claiming those profits.

Waiver is the voluntary and intentional relinquishment of a known right.[44]  A court may infer waiver from the conduct of a party to a contract, but a court cannot infer waiver from mere indulgence or silence.[45]  "The intent to waive known rights is essential."[46]  Here, Plaintiffs

---

[43]Doc. 87, at 6, ¶ 42.

[44]*Lyon ex rel. Lawing v. Holder*, 163 P.3d 343, 349 (Kan. Ct. App. 2007).

[45]*Id.*; *Long v. Clark*, 135 P. 673 (Kan. 1913).

[46]*Stratmann v. Stratmann*, 628 P.2d 1080, 1087 (Kan. Ct. App. 1981) (quoting *Prather v. Colo. Oil & Gas Corp.*, 542 P.2d 297 (1975)).

allowed Defendants to retain all of the cash revenues from the projects, including the amount they now claim for profits.  But Plaintiffs in their own records, which had been sent to Hall, showed that these funds would be used to repay the aggregate Overhead Costs that were still outstanding.  Further, nothing in the record shows that Plaintiffs knew that all Overhead Costs had been repaid in full.  As such, the Court cannot find, as a matter of law, that by designating the share of revenues that they believed they were owed from each project to repayment of aggregate Overhead Costs, Plaintiffs knowingly and intentionally waived their right to bring a breach of contract action against Hall for profits owed to them after the aggregate Overhead Costs were paid in full.  Therefore, Defendants are not entitled to summary judgment based on waiver.

Beyond waiver, Defendants argue that equitable estoppel bars Plaintiffs from bringing their claim for breach of contract against Defendant Hall.  "A party seeking to invoke equitable estoppel must show that the acts . . . or silence of another party (when it has a duty to speak) induced the first party to believe certain facts exited.  There must also be a showing that the first party rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts."[47]  Defendants claimed that Plaintiffs induced Hall into believing that he owed Plaintiffs no further profits by allowing him to keep all of the profits under each project.  By inducing him to believe this, Defendants argue, Plaintiffs further induced Hall into continuing under the Funding Agreement.  Defendants, however, have not produced any evidence to support their claim that Hall was induced to believe that Plaintiffs were not owed any profits on the projects.  Defendants have similarly failed to produce any

---

[47]*Toshiba Master Lease, Ltd. v. Ottawa Univ.*, 927 P.2d 967, 972 (Kan. Ct. App. 1996).

evidence that shows that Hall relied on Plaintiffs' conduct to his detriment.  Defendants have

thus failed to meet their burden for this defense because they have not presented any evidence to

show inducement, reliance, or prejudice.  As a result, they have not shown that each element is

without a genuine issue of material fact, such that they are entitled to judgment as a matter of

law on Plaintiffs' breach of contract claim.

### 3.      Statute of Limitations

Defendants further argue that Hall is entitled to summary judgment on the breach of

contract claim for the Weibel-RBND and Morley SWAT projects because they fall outside of the

five-year statute of limitations.  As discussed above, however, Plaintiffs would not have earned

any profits on the Wiebel-RBND and Morley SWAT projects.  As such, Defendants' assertion

that those claims are time-barred is moot.

### B.      Quantum Meruit

Defendants also move for summary judgment as to Defendants Bentley and the Trust on

Plaintiffs' quantum meruit claim.  Quantum meruit, or unjust enrichment, "lies in a promise

implied in law that one will restore to the person entitled thereto that which in equity and good

conscience belongs to him."[48]  Unjust enrichment creates, on the basis of equity and justice, a

quasi-contract, which is used to enforce noncontractual duties.  To succeed on a claim for

quantum meruit, or unjust enrichment, a plaintiff must show, "(1) a benefit has been conferred

upon the defendant, (2) the defendant retains the benefit, and (3) under the circumstances, the

defendant's retention of the benefit is unjust."[49]  Defendants claim that Plaintiffs failed to meet

---

[48]*Peterson v. Midland Nat'l Bank*, 747 P.2d 159, 166 (Kan. 1987).

[49]*Estate of Draper v. Bank of Am., N.A.*, 205 P.3d 698, 706 (Kan. 2009).

the requirements for their quantum meruit claims against Defendants Bentley and the Trust.[50]

Because Bentley and the Trust had different levels of participation in the parties' dispute, the

Court will discuss their possible liability under quantum meruit separately.

    *1.*    ***Bentley***

The Court will first examine whether Bentley is entitled to summary judgment on the

quantum meruit claim, such that no genuine issue of material fact exists as to any of the required

elements and Bentley is entitled to judgment as a matter of law.  Defendants raise a number of

arguments against the quantum meruit claim.  Defendants claim that Bentley received no benefit

and Plaintiffs are only using this claim to collect their damages from Hall's breach of contract.

Further, Defendants argue that if they did receive any benefit, third parties conferred the benefit

and not Plaintiffs.  Defendants final assertion claims that Bentley did not know of or appreciate

any benefit.

    Defendants first argue that Bentley received no benefit from Plaintiffs, analogizing this

case to *Venture Commercial Mortgage, LLC v. FDIC*,[51] a case applying Arizona law.  Under

*Venture*, a plaintiff had entered into various agreements with a bank to serve as a broker and earn

placement and extension fees.[52]  Sometime later, after the plaintiff had been performing under

the agreements, the bank closed.[53]  The FDIC took over as receiver for the bank, and the

---

[50]Defendants cite to slightly different elements because the case they cite for the elements of quantum meruit applied Arizona Law.  *Venture Commercial Mortg., LLC v. FDIC*, No. 09-2285-KHV, 2010 WL 820711, at *5 (D. Kan. Mar. 5, 2010).  The Court, however, considers Defendants' arguments within the three requirements under Kansas Law.

[51]*Id.*

[52]*Id.* at 1.

[53]*Id.* at 2.

defendant purchased a loan agreement, under which the bank still owed the plaintiff fees.[54]  The plaintiff then sued the purchaser of the loan agreement.[55]  The court dismissed the case because the defendant was not a party to the agreement, it assumed no liability, and it received no benefits.[56]

Here, Defendants argue that Bentley is just like the purchaser of the loan agreement in *Venture* because it was not a party to the Funding Agreement and cannot be sued for damages arising under obligations of the parties to the Funding Agreement.  The Court is unpersuaded by Defendants' argument.  First, the fact that Bentley was not a party to the agreement does not affect the application of quantum meruit.  As described above, quantum meruit arises in situations where no contract governs the parties' relationship.  Second, unlike the purchaser of the loan agreement and the bank broker in *Venture*, Bentley and Plaintiffs had a direct, ongoing relationship as Plaintiffs performed their services under the Funding Agreement.  Indeed, Bentley was created to manage the finances from each project and to pay those funds out according to the Funding Agreement.  Bentley, along with the other parties, kept track of all funds advanced and received under the Funding Agreement relationship.  Thus, Bentley is not merely an unsuspecting third party who entered the dispute late in the game.  Nor is Bentley merely a place where Hall held his share of the payout.  Plaintiffs have evidence to show Bentley entered a relationship with Plaintiffs, actively participated in projects, and retained those benefits without paying Plaintiffs for the value of the benefit.  And therefore, Plaintiffs do not seek

---

[54]*Id.* at 3.

[55]*Id.* at 4.

[56]*Id.* at 11.

"'restitution from the other merely because of the failure of performance by the third party.'"[57]
Plaintiffs quantum meruit claim is based on the direct relationship that they had with Bentley and
not merely Hall's breach of contract.

Not only have Plaintiffs presented evidence of this ongoing relationship, but they have
presented evidence to show that the relationship directly benefitted Bentley.  Plaintiffs worked to
find real estate investments that would become profitable; all cash generated from these projects
went to Bentley before they were distributed under the Funding Agreement.  Because Bentley
received the cash revenues as a result of Plaintiffs' services—even though the cash revenues
came from the projects and not directly from Plaintiffs—Plaintiffs conferred a benefit on
Bentley.

Defendants' final argument asserts that Plaintiffs have produced no evidence to show that
Bentley knew of or appreciated the benefit conferred by Plaintiffs.  The Court finds a genuine
issue of material fact on this element of the quantum meruit claim.  Plaintiffs have presented
evidence that the parties had regular meetings to discuss investment opportunities and the
records contained in the Bentley books.  In the Bentley Books, Plaintiffs show that they were
entitled to profits.  When Plaintiffs requested the payment of those profits, Bentley did not pay
them.  This evidence is sufficient to create a genuine issue of material fact as to whether Bentley
knew of or appreciated the benefit conferred by Plaintiffs.  Thus, Bentley is not entitled to
judgment as a matter of law on the quantum meruit claim.

### 2.    *The Trust*

The Court next examines whether the Trust is entitled to summary judgment on the

---

[57]*See J.W. Thompson Co. v. Welles Prods. Corp.*, 758 P.2d 738, 744 (1988) (quoting Restatement of
Restitution § 110).

quantum meruit claim.  Unlike the evidence Plaintiffs presented for Bentley, Plaintiffs have not shown that they conferred any benefit on the Trust.  While Plaintiffs have shown that the cash revenues from each project were received by Bentley for distribution under the Funding Agreement, the same is not true for the Trust.  Defendants have pointed to the lack of evidence showing that the Trust received any payments from the projects.  And indeed, although Plaintiffs have stated that the Trust was the only member of Bentley, Plaintiffs specifically state that there is no evidence regarding whether any of the cash revenues held by Bentley were removed by the Trust.  As such, Plaintiffs lack evidence for an essential element of their claim against the Trust. Therefore, the Trust is entitled to summary judgment on the quantum meruit claim.

### 3.      *Statute of Limitations*

Defendants also argue that Plaintiffs' quantum meruit claim against Bentley is time barred.  Defendants argue that Plaintiffs' quantum meruit claim began accruing when the cash revenues for each project were distributed under the Funding Agreement.  As a result, Defendants assert that Plaintiffs' quantum meruit claim for profits under Weibel-RBND, Morley SWAT, Shorefox, Grand Elk, MCFD, and SWAT 15 are barred by the statute of limitations because they closed more than three years before Plaintiffs filed this action on August 17, 2010. Plaintiffs respond, arguing that the cause of action did not begin to accrue until much later, when they demanded profits from Defendants.

Under Kansas law, quantum meruit claims are subject to a three-year statute of limitations.[58]  "In general, a cause of action accrues, so as to start the running of the statute of limitations, as soon as the right to maintain a legal action arises.  The true test to determine when

---

[58]K.S.A. § 60-512.

an action accrues is that point in time at which the plaintiff could first have filed and prosecuted his action to successful conclusion."[59]  Thus, for an unjust enrichment claim, the cause of action accrues when all three required elements are present, and this generally occurs at the point in time when the "enrichment becomes unjust."[60]  "Often this means that the action accrues when there is a request for return of the property or when payment is made to or property is received by the defendant."[61]

Here, Plaintiffs have presented evidence to show that Bentley agreed to hold Plaintiffs' profits for future Overhead Costs.  The Bentley Books, which were sent to Defendants, showed that Plaintiffs were receiving profits on each of the projects in dispute and that those amounts were allocated to reduce Overhead Cost.  Plaintiffs have further shown that the Parties met to discuss the finances on several occasions and e-mails were exchanged that discussed the amount of Plaintiffs' profit that Defendants held for Plaintiffs.  While Defendants dispute these facts, Plaintiffs' evidence is sufficient to create a genuine issue of material fact as to whether an agreement to hold funds existed.  If the agreement existed, Bentley's retention of the benefits did not become unjust until Plaintiffs requested the return of their profits.  Plaintiffs made their request in November 2009.  Plaintiff filed this action less than three years after that date.  Thus, the Court cannot find that as a matter of law Plaintiffs' quantum meruit claim against Bentley is barred by the statute of limitations.

---

[59]*Pancake House, Inc. v. Redmond*, 716 P.2d 575, 579 (Kan. 1986).

[60]*Estate of Draper*, 205 P.3d at 715 (citing *Vila v. Inter-Am. Inv., Corp*, 536 F. Supp. 2d 41, 51 (D.D.C. 2008)).

[61]*Id.* (citing *Hartman v. Stumbo*, 408 P.2d 693 (Kan. 1965); *Desai v. Franklin*, 895 N.E.2d 875 (Ohio Ct. App. 2008)).

**IV.     Conclusion**

The Court grants Defendants summary judgment on some of Plaintiffs' claims. Specifically, the Court grants summary judgment to the Trust on Plaintiffs' quantum meruit claim and to Hall on Plaintiffs' breach of contract claim for the Morley SWAT project. Plaintiffs' other claims, however, survive summary judgment because the Court cannot find that Defendant is entitled to judgment as a matter of law.  The Court finds that the Funding Agreement clearly and unambiguously requires repayment of all Overhead Costs before any payments are made under sections 5(c)–(f) of the Funding Agreement—no one could receive profits before all Overhead Costs were repaid.  The Court directs the parties to meet and confer to determine what amount of profits, if any, Plaintiffs are owed on the remaining projects using the interpretation of the Funding Agreement that the Court has described in this Order.  The parties should be prepared to present a clear and concise explanation of the distribution of cash revenues for each remaining project to the Court at trial.

**IT IS SO ORDERED BY THE COURT** that Defendants' Motion for Partial Summary Judgment (Doc. 86) is GRANTED IN PART and DENIED IN PART.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment on the Issue of Contract Interpretation (Doc. 88) is DENIED.

**IT IS SO ORDERED**.

Dated: <u>February 14, 2012</u>

           S/ Julie A. Robinson
           JULIE A. ROBINSON
           UNITED STATES DISTRICT JUDGE